**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No**. _____**

SAMANTHA MARQUIS, derivatively on behalf of
AMPIO PHARMACEUTICALS, INC.,

       Plaintiff,

       v.

MICHAEL A. MARTINO, MICHAEL
MACALUSO, HOLLI CHEREVKA,
DAVID BAR-OR, DAVID STEVENS, J.
KEVIN BUCHI, PHILIP H. COELHO,
and RICHARD B. GILES,

       Defendants,

    -and-

AMPIO PHARMACEUTICALS, INC.,

       Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Samantha Marquis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

and on behalf of Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Michael A. Martino ("Martino"),

Michael Macaluso ("Macaluso"), Holli Cherevka ("Cherevka"), David Bar-Or ("Bar-Or"), David

Stevens ("Stevens"), J. Kevin Buchi ("Buchi"), Philip H. Coelho ("Coelho"), and Richard B. Giles

("Giles") (collectively, the "Individual Defendants," and together with Ampio, the "Defendants")

1

for breaches of their fiduciary duties as directors and/or officers of Ampio and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, she alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ampio's directors and officers from December 29, 2020 to August 3, 2022 (the "Relevant Period").

2.       As a biopharmaceutical company, Ampio is focused on the development of immunomodulatory therapies for the treatment of pain stemming from osteoarthritis in the knee and potentially other articular joints.

3.      Ampio's lead product candidate, Ampion, is purportedly for the treatment multiple inflammatory conditions. Ampion's applicability to the treatment of a wide array of serious, debilitating and often life-threatening inflammatory diseases in the joints, lungs, kidneys, and other organs is being studied. The Company is also developing Ampion to be used as an inhaled

treatment for critically-ill COVID-19 patients and as an at-home treatment for COVID-19 patients who suffer from long-term respiratory symptoms.

4.     To commercialize Ampion, the Company must first complete a Biologics License Application ("BLA"), which in turn requires, *inter alia*, the submission of pre-clinical studies and clinical studies. Accordingly, the Company has administered several clinical trials of Ampion.

5.     After receiving approval from the United States Food and Drug Administration ("FDA") to start conducting the study and guidance from the Center for Biologics Evaluation and Research ("CBER") on how to conduct the study, the Company commenced its first clinical trial in November 2012. Although the Company's first clinical trial was successful, it failed to achieve all of the endpoints Ampio wanted the clinical trial to cover.

6.     Accordingly, in January 2014, the Company commenced a second clinical trial. This second clinical trial utterly failed, which caused the Company to initiate another second trial.

7.     In July 2015, the Company commenced its new second trial, which also failed. Having been unsuccessful with its clinical trials and thus its completion of the BLA, the Company faced looming chaos.

8.     In June 2019, the Company commenced a phase III clinical trial titled "A Randomized, Controlled, Double-Blind Study to Evaluate the Efficacy and Safety of an Intra-Articular Injection of Ampion in Adults with Pain Due to Severe Osteoarthritis of the Knee" (the "AP-013 study").

9.     In March 2020, the COVID-19 pandemic caused the Company to halt the AP-013 study. Several months later, in December 2020, the Company claimed it had received approval from the FDA to continue with the AP-013 study without having to re-run the trial.

10.     Subsequently, the Individual Defendants issued false and misleading statements to the public regarding Ampion's purported inflammation-reducing properties as well as the Company's receipt of positive guidelines from the FDA.

11.     On November 10, 2021, the Company filed its quarterly report with the SEC for the fiscal quarter ended September 30, 2021 on Form 10-Q (the "3Q21"). In the 3Q21, the Company assured stockholders that Ampio had enough liquidity to successfully fund operations throughout the first quarter of 2023.

12.     That same day, the Company held an earnings call to discuss its financial results for the fiscal quarter ended September 30, 2021. On the earnings call, Defendant Cherevka falsely claimed that Ampion study results had been positive. Then in December 2021, Defendant Martino, who was the Company's new Chief Executive Officer ("CEO"), also falsely claimed that the Company was appropriately applying for FDA guidance for its AP-013 study.

13.     On March 2, 2022, the Company disclosed that it had submitted a Type C[1] meeting request to the FDA for the development and review of Ampion.

14.     However, on April 20, 2022, the Company issued a press release announcing that the FDA had not responded favorably to the Type C meeting request as the FDA, *inter alia*, did not believe that "AP-013 could serve as a second pivotal trial for Ampion." The FDA communication also disclosed that the AP-013 study was insufficient for the Company to receive regulatory approval in the United States or any other country.

---

[1] A Type C meeting is a meeting with the CBER/FDA to go over the development and the review of a product. The scope of a Type C meeting falls outside the scope of Type A and Type B.

15.     On this news, the Company's share price dropped $0.09, or 26.5%, from a close of $0.34 on April 20, 2022 to a close of $0.25 on April 21, 2022.

16.     On May 16, 2022, Ampio announced that the Company's Board of Directors ("Board") had created a special committee ("Special Committee") to conduct an internal investigation, with the help of independent counsel, into the AP-013 study and other clinical trials.

17.     On this news, the Company's share price dropped $0.04, or 18%, from a close of $0.22 on May 16, 2022 to a close of $0.18 on May 18, 2022.

18.     On August 3, 2022, before markets opened, the Company published a letter from Defendants Martino and Buchi to Ampio stockholders regarding the results of the Special Committee's investigation (the "Stockholder Letter"). The Stockholder Letter revealed that, since March 2020, the Company's senior executive officers and senior staff had been aware of the AP-013 study's failure. The Stockholder Letter further revealed that the senior executives and senior staff were aware that the AP-013 study did not demonstrate efficacy for Ampion with regard to its co-primary endpoints of pain and function. Moreover, the Stockholder Letter stated that the aware senior executives and senior staff failed to disclose the actual results of and the timing of unblinding of data from the AP-013 study. The Stockholder Letter also revealed that certain executives and former directors "facilitated the provision of Ampion for unauthorized use."

19.     On this news, the Company's share price dropped $0.05, or 32%, from a close of $0.1562 on August 2, 2022 to a close of $0.1034 on August 3, 2022. Given that the Company's share price traded as high as $2.76 on December 22, 2020, the Company's closing share price of $0.1034 on August 3, 2022 represented a staggering 96.25% fall in value. The Company later admitted that, after seven phase II and III trials involving more than 1,500 patients who were

treated with Ampion and more than 1,400 patients who were treated with saline, "Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial verses saline would not be commercially competitive."

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding Ampio's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Ampio's public statements were materially false and misleading at all relevant times.

21.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

22.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls. As stated in the Form 10-Q that the Company filed with the SEC on May 16, 2022 for the fiscal quarter ended March 31, 2022 ("1Q22"):

> Based upon this evaluation, the CEO and the CFO concluded that our disclosure controls and procedures as of the end of the period covered by this report were not effective due to the matters identified as part of the Company's decision announced on May 16, 2022 to conduct an internal investigation, to be overseen by an

independent special committee, as described in Part II, Item 5 of this Quarterly Report on Form 10-Q.

23.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Company repurchased 138,514 shares of its common stock at inflated prices during the Relevant Period for over $78,953. As the Company's stock was actually only worth $0.10 per share, the price at close on August 3, 2022, the Company overpaid approximately $65,102 in total.

24.     Moreover, during the Relevant Period, two of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $214,468.

25.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Ampio, its current and former CEOs, and its former Chief Operating Officer ("COO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and will likely cost the Company millions of dollars going forward.

26.     In light of the Individual Defendants' breaches of fiduciary duty, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Ampio's Board cannot consider a demand to commence litigation against

themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act and 17 C.F.R. § 240.14a-9.

28.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she has, directly or indirectly, used the means and instrumentalities of interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

32.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in activities that have had an effect in this District.

## PARTIES

### Plaintiff

33.     Plaintiff is a current shareholder of Ampio common stock. Plaintiff has continuously held Ampio common stock at all relevant times.

### Nominal Defendant Ampio

34.     Ampio is a Delaware corporation with its principal executive offices at 373 Inverness Parkway, Suite 200, Englewood, Colorado 80112. Ampio's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "AMPE."

### Defendant Martino

35.     Defendant Martino has served as the Company's CEO since November 2021 and as a Company director since October 2021.

36.     For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Martino received $760,718 in executive compensation and $221,498 in director compensation from the Company. This included $60,417 in salary, $700,301 in stock awards, $208,477 in option awards, and $13,021 in fees earned or paid in cash.

### Defendant Macaluso

37.     Defendant Macaluso has served as Ampio's advisor to the CEO from November 2021 to May 2022, as a Company director from March 2010 to May 2022, as CEO from January 2012 to November 2021, and as Chairman of the Board from May 2010 to November 2021.

38.     For the 2021 Fiscal Year, Defendant Macaluso received $1,914,818 in compensation from the Company. This included $356,818 in salary and $1,558,000 in stock awards.

9

39.     Upon information and belief, Defendant Macaluso is a citizen of Colorado.

**Defendant Cherevka**

40.     Defendant Cherevka served as the Company's President from October 2021 to May 2022, as CEO from September 2017 to May 2022, as Vice President of Operations from May 2015 to September 2017, as senior director of clinical trials from November 2013 to May 2015, and as director of clinical trials from January 2013 to November 2013.

41.     For the 2021 Fiscal Year, Defendant Cherevka received $1,126,591 in compensation from the Company. This included $301,591 in salary, $5000 in bonus, and $820,000 in stock awards.

42.     During the period of time when Ampio materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cherevka made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/27/2021 | 74,631 | $2.00 | $149,262 |
| 5/21/2021 | 2,603 | $2.00 | $5,206 |

Thus, in total, before the fraud was exposed, she sold 77,234 Company shares on inside information, for which she received approximately $154,468. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

43.     Upon information and belief, Defendant Cherevka is a citizen of Colorado.

**Defendant Bar-Or**

44.     Defendant Bar-Or has served as a Company director since March 2010 until he resigned in May 2022, as Chief Scientific Officer ("CSO") from March 2010 to September 2018, and as the Chairman of the Board from March 2010 to May 2010.

45.     For the 2021 Fiscal Year, Defendant Bar-Or received $221,381 in compensation from the Company. This included $38,500 in fees earned or cash paid, $20,000 in stock awards, and $162,881 in option awards.

46.     Upon information and belief, Defendant Bar-Or is a citizen of Colorado.

**Defendant Buchi**

47.     Defendant Buchi has served as a Company director since October 2021. He also serves as the Chair of the Board and as a member of the Audit Committee.

48.     For the 2021 Fiscal Year, Defendant Buchi received $254,498 in compensation from the Company. This included $11,521 in fees earned or cash paid and $242,977 in option awards.

**Defendant Coelho**

49.     Defendant Coelho served as a Company director from April 2010 until he resigned in May 2022.

50.     For the 2021 Fiscal Year, Defendant Coelho received $357,048 in compensation from the Company. This included $109,667 in fees earned or cash paid, $30,000 in other compensation, $20,000 in stock awards, and $197,381 in option awards.

51.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Coelho made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 4/27/2021 | 20,000 | $2.00 | $40,000 |
| 4/29/2021 | 3,263 | $2.00 | $6,526 |
| 5/21/2021 | 6,737 | $2.00 | $13,474 |

Thus, in total, before the fraud was exposed, he sold 30,000 Company shares on inside information, for which he received approximately $60,000. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Giles**

52.     Defendant Giles served as a Company director from August 2010 until he resigned in May 2022.

53.     For the 2021 Fiscal Year, Defendant Giles received $292,881 in compensation from the Company. This included $75,500 in fees earned or cash paid, $20,000 in stock awards, and $197,381 in option awards.

54.     Upon information and belief, Defendant Giles is a citizen of Colorado.

**Defendant Stevens**

55.     Defendant Stevens has served as a Company director since June 2011. He also serves as a member of Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.

56.     For the 2021 Fiscal Year, Defendant Stevens received $288,921 in compensation from the Company. This included $71,540 in fees earned or cash paid, $20,000 in stock awards, and $197,381 in option awards.

### INDIVIDUAL DEFENDANTS' MISCONDUCT

#### Background

57.     Ampio is a biopharmaceutical company focused on the development of novel therapies for the treatment of inflammatory conditions.

58.     On November 12, 2010, the Company filed its registration statement on Form S-1 with the SEC (the "Registration Statement"). The Company disclosed in the Registration Statement its lead product candidate, Ampion – an investigational new drug ("IND").

59.     Ampion is a non-steroidal, low molecular weight, anti-inflammatory biologic purportedly being developed to treat a variety of inflammatory conditions, including severe osteoarthritis of the knee ("OAK").

60.     As the Company wishes to commercialize Ampion, it must first complete and submit a BLA for Ampion, a process which requires the Company to complete a number of clinical trials and to tailor each process specifically to each product.

61.     The Company also disclosed in the Registration Statement that it planned to conduct the phase I and II trials in India or Australia, with each trial estimated to cost under $0.5 million and to start in either the second or third fiscal quarter of 2011. The Company further estimated that it would take twenty-four months for the trials to complete.

62.     In 2010, the Company also announced its intentions of applying for approval of a phase II double-blind, placebo-controlled clinical study of Ampion, which would help to explore

the possibility of Ampion's application to the treatment of chronic inflammatory and autoimmune disease.

63.    In October 2011, the Company issued a press release announcing the results of the Company's clinical trial – the Ampion-In-Knee Australian clinical trial. Regarding the  first-ever trial of Ampion on humans, Defendant Macaluso disclosed that the drug was "well tolerated and reduced pain over and above steroids" and that "[t]he completion of this expansion will allow Ampio to augment the data that will be presented to the FDA."

64.    In June 2012, the Company announced it had met with the FDA, signaling the fulfillment of a requirement that the Company had to meet before it would be allowed to start working on an IND. Specifically, the Company stated that it had reached an agreement with the FDA on the design of a clinical trial for Ampion for the treatment of OAK in the United States.

65.    In November 2012, the Company announced that CBER, a division of the FDA, had provided guidance to the Company on how to conduct open label and placebo-controlled trials that would maximize clinical efficacy data and patient safety.

66.    In April 2013, the FDA approved the Company's request to conduct a study on fifteen patients to test the Company's IND for the treatment of OAK (the "AP-003-A study"). The study revealed a positive outcome.

67.    In August 2013, the Company issued a press release announcing the positive results of the AP-003-A study, but also stating that there were still some primary objectives left unfulfilled by the AP-003-A study.

68.    In December 2013, the Company issued a press release announcing the FDA's approval of the AP-003-A study's results and that the FDA had provided guidance on conducting

14

the second and final clinical trial for Ampion with regards to its treatment of OAK (the "AP008" study). This second trial was critical for Ampio as it would allow the Company to receive the BLA.

69.     In 2015, the Company completed the AP008 study, which failed due to it not reaching the primary endpoints that the Company had set.

70.     In July 2015, the Company held a call with its investors to disclose the results of its meeting with the FDA after the failure of the AP008 study. In the call, the Company announced it would be conducting a special protocol assessment ("SPA"), whereby the Company would prepare an agreement outlining the size and design of a clinical trial which could then be used by the Company to form the basis for efficacy for a BLA filing.

71.     According to the SPA, the Company needed to complete a second phase III pivotal trial for Ampion ("Phase III trial"). When the Phase III trial commenced on September 22, 2015, Defendant Macaluso stated in a news release that:

> [T]his second pivotal trial is clinically identical to the previously successful Spring Study, which was confirmed by the agency as one of the two pivotal trials required for approval. In our recent communication with the agency confirming the SPA, the FDA wrote: protocol AP-003-B is adequate to serve as a pivotal trial in support of a future BLA. With positive results and an SPA, Ampion™ has a clearly defined path to market.[2]

72.     In June 2016, the Company announced the Phase III trial's results, which were similar to those of the AP008 study and also failed to meet the primary endpoint. As the Phase III trial's results was a cause for concern to the Company regarding its ability to obtain the BLA, the Company met with the CBER in 2016 on two separate occasions to determine how the Company

---

[2]https://www.prnewswire.com/news-releases/ampio-receives-special-protocol-assessment-spa-from-the-fda-and-commences-second-phase-iii-pivotal-trial-of-ampion-300146610.html

could do so. The Company would struggle for the next three years and fail to advance the product through its late-stage clinical trials in the United States.

73.     In June 2019, the Company received a second SPA from the FDA to conduct another phase III trial, this time called the AP-013 study. In March 2020, due to the COVID-19 pandemic, the Company stopped enrolling patients for the AP-013 study, eventually pausing all activities related to that study.

74.     In September 2020, the Company announced that the Company had conducted a phase I clinical trial on Ampion's treatment for COVID-19 patients, the results of which were positive.

75.     In October 2020, the Company began its phase I clinical trial to study the effects of inhaled Ampion in COVID-19 patients diagnosed with respiratory distress issues (the "AP-014" study). The Company touted that the AP-014 study showed "an improvement in all-cause mortality in COVID-19 patients."

76.     However, prior to closing the activities related to the AP-013 study, the Individual Defendants knew that the AP-013 study did not present a positive result because the study failed to indicate any efficacy for Ampion with regards to its primary endpoints of pain and function.

**False and Misleading Statements**

*December 29, 2020 Press Release*

77.     On December 29, 2020, the Company issued a press release titled "Ampio Receives Feedback from the FDA on Ampio's Proposed Modifications to the Special Protocol Assessment for Ampion Treatment of Severe Osteoarthritis of the Knee," announcing that the FDA had given permission for the Company to "complete the [AP-013] study without running the trial." The press

release further stated that "[t]he FDA options gives us the opportunity to provide additional evidence to support the use of existing data/or add more patients to the trial."

### March 3, 2021 Earnings Call

78.     On March 3, 2021, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2020. On the call, Defendant Cherevka commented on Ampion's efficacy with regard to reducing inflammation and claimed the following, in relevant part: "[I]n the laboratory, Ampion has been shown to uniquely reduce inflammation along multiple pathways, unlike other anti-inflammatory therapies that target only one pathway."

### May 5, 2021 Press Release

79.     On May 5, 2021, the Company issued a press release titled "Ampio Pharmaceuticals, Inc. Reports First Quarter 2021 Financial Results and Provides Business Update," announcing that "[p]ositive FDA response provides guidance on multiple pathways forward on paused AP-013 Phase III trial in osteoarthritis of the knee (OAK)."

80.     In the press release, Defendant Macaluso was quoted as touting:

This has been an important quarter for Ampio, with noted progress across our therapeutic platform. For example, the FDA has recently responded to our plans for the AP-013 Phase III trial for the intra-articular injection of Ampion for patients suffering from severe osteoarthritis of the knee (OAK). The response not only provides us with flexibility for maintaining the Special Protocol Assessment (SPA) but, in addition, allows us to consider several alternative paths forward to an optimal solution that may include strategic discussions with potential partners for the commercialization, and expansion of osteoarthritis indications, of Ampion.

***June 16, 2021 Press Release***

81.     On June 16, 2021, the Company issued a press release titled "Ampio Provides

Update on Osteoarthritis of the Knee (OAK) Program, Reiterates Compelling Data in Earlier Phase

III Trials of Ampion in Severe OAK," which quoted Defendant Macaluso as stating:

> Ampion is on track to become the first novel drug with unique mechanisms of
> action on the market for OAK in over 20 years. Ampion treatment has demonstrated
> consistent clinical efficacy in patients suffering from OAK across multiple trials,
> periods of time and clinical sites. In addition, the FDA has provided written
> confirmation that the AP-003-A study provides evidence of the effectiveness of
> Ampion . . . . We continue to remain confident the data from the suspended Phase
> III AP-013 trial will show similar safety and efficacy, but the decision whether to
> unblind this double masked, randomized controlled study or to continue adding
> patients ideally should be jointly decided with future potential partners.

***June 30, 2021 Proxy Statement***

82.     On June 30, 2021, the Company filed a proxy statement on Schedule 14A with the

SEC (the "2021 Proxy Statement"). Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens

solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which

contained material misstatements and omissions.

83.     The 2021 Proxy Statement called for the Company shareholders to vote to, *inter*

*alia*: (1) elect Defendant Macaluso, Bar-Or, Coelho, Giles and Stevens to the Board; (2) ratify the

selection of Moss Adams LLP as the Company's independent registered public accounting firm

for the fiscal year ending December 31, 2021; and (3) approve, via non-binding advisory vote, the

compensation of the Company's named executive officers.

84.     Under the heading "Code of Business Conduct and Ethics," the 2021 Proxy

Statement stated:

> We have adopted a Code of Business Conduct and Ethics that is applicable to all of
> our employees, officers, and directors, all of which have read, acknowledged, and

agreed to comply with such code. The code is available on our web site, *www.ampiopharma.com*, under the "Investors" tab. We intend to disclose future amendments to, or waivers from, certain provisions of our Code of Business Conduct and Ethics, if any, on the above website within four business days following the date of such amendment or waiver.

85.     Under the heading "Insider Trading Policy," the 2021 Proxy Statement stated:

We have adopted an Insider Trading Policy that is applicable to all of our officers and directors and all of our employees, consultants, and contractors (including members of scientific advisory committees), who receive or have access to material nonpublic information about the Company. The Insider Trading Policy prohibits the misuse of material nonpublic information in trading of the Company's securities.  The Insider Trading Policy also prohibits short sales, transactions in derivative securities on the Company's securities, pledges of the Company's securities as collateral for loans, and hedging or monetization transactions or similar arrangements with respect to the Company's securities.

86.     Under the heading "Risk Oversight," the 2021 Proxy Statement stated:

The Board oversees risk management directly and through its committees associated with their respective subject matter areas. Generally, the Board oversees risks that may affect our business, including operational matters and other matters that have been adversely impacted by the COVID-19 pandemic. The Board is also responsible for reviewing and approving the Company's annual insurance policies renewal, which includes Directors and Officers insurance. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. Our Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

The Audit Committee is responsible for oversight of our accounting and financial reporting processes and discusses with management our financial statements, internal controls and other accounting and auditing matters. The Compensation Committee oversees certain risks related to compensation programs and the Nominating and Governance Committee oversees certain corporate governance risks. The Disclosure Committee assists in establishing, implementing, maintaining and evaluating controls or other procedures to ensure that the information required to be disclosed in the Company's reports

furnished or filed under the Exchange Act is properly communicated to the CEO and the CFO. As part of their roles in overseeing risk management, these committees periodically report to the Board regarding briefings provided by management and advisors as well as the committees' own analysis and conclusions regarding certain risks faced by us. Management is responsible for implementing the risk management strategy and developing policies, controls, processes and procedures to identify and manage risks.

87.     The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company failed to follow its Code of Business Conduct and Ethics (the "Code of Conduct"), as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by two of the Individual Defendants, and Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens' failures to report violations of the Code of Conduct.

88.     Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens further caused the 2021 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 82-86, by failing to disclose, *inter alia*, that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

89.     As a result of Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendant Macaluso, Bar-Or, Coelho, Giles and Stevens to the Board; (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; and (3) approve, via non-binding advisory vote, the compensation of the Company's named executive officers.

***August 4, 2021 Earnings Call***

90.     On August 4, 2021, the Company held an earnings call to discuss its financial results for the second fiscal quarter of 2021. On the call, Defendant Macaluso disclosed that the Company had decided to unblind the data from the AP-013 study, despite the Company having "worked diligently with the FDA to gain better understanding of our viable options to preserve the study results to-date, which include keeping the special protocol assessment in place."

91.     Moreover, Defendant Macaluso stated that the purpose behind unblinding the data from the AP-013 study was to eliminate any bias from the pandemic. Defendant Macaluso also stated that, pursuant to "a requirement of the FDA," the data would not be released until the data had "been properly cleaned and validated" and "properly reflected into the database." As later revealed, this claim was not true as the decision to unblind the data from the AP-013 study was pre-emptively done without even the FDA's permission.

***November 10, 2021 Form 10-Q***

92.     On November 10, 2021, the Company filed its 3Q21. The 3Q21 was signed by Defendant Macaluso and contained Sarbanes-Oxley Act of 2022 ("SOX") certifications signed by Defendants Macaluso attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

93.      The 3Q21 made certain to stockholders that the Company had $17.1 million in cash and cash equivalents, which would provide the Company enough liquidity to fund its operations throughout the first quarter of 2023.

94.     The 3Q21 further stated that:

While the Company believes that the studies currently being conducted will be successful, the Company expects to raise additional capital in both the near and long-term to enable it to support its business operations, including specifically (i) clinical development of Ampion, (ii) Biologics License Application ("BLA") preparation and submission, (iii) existing base business operations and (iv) commercial development activities for Ampion.

### November 10, 2021 Earnings Call

95.    On November 10, 2021, the Company held an earnings call to discuss its financial results for the third fiscal quarter of 2021. On the call, Defendant Cherevka stated:

In addition to providing evidence if safety and efficacy in pain and function, pre-clinical and early clinical studies have shown that Ampion impacts multiple genes related to repair and regeneration of cartilage. These published findings suggest that Ampion treatment may prime stem cells for both mobilization and chondrogenic differentiation, potentially explaining some of the beneficial effects achieved in clinical trials with the Ampion treatment.

### December 1, 2021 Business Update Conference Call

96.    On December 1, 2021, the Company held a business update conference call on which Defendant Martino was introduced as the new CEO of the Company. On the call, Defendant Martino stated that the Company was applying the FDA guidance appropriately to the AP-013 study.

### March 2, 2022 Press Release

97.    On March 2, 2022, the Company issued a press release titled "Ampio Pharmaceuticals, Inc. Release Positive Phase 3 Data Analysis for Ampion Targeting Sever Osteoarthritis of the Knee (OAK)," announcing it had submitted to the FDA a Type C meeting request to meet with the CBER to discuss the development and review of Ampion.

98.    In the press release, Defendant Cherevka stated that the FDA had suggested Ampio conduct a sensitivity analysis to determine whether the AP-013 study had been affected by the

COVID-19 pandemic. The press release further quoted Defendant Cherevka as stating that the Company's sensitivity analysis found "a statistically significant impact from COVID-19, and as specified in our study plan, we have proposed a mITT population to assess efficacy."

99.    The statements in ¶¶ 77-81 and ¶¶ 90-98 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

*April 20, 2022 Press Release*

100.    On April 20, 2022, the Company issued a press release titled "Ampio Provides Regulatory Update," announcing the following, in relevant part:

> FDA responded that it did not agree with the Company's proposed change from the ITT population to the mITT population for the primary endpoint analysis, that mITT is a substantive and material change to the Protocol and Statistical Analysis Plan that is not in accordance with the Special Protocol Assessment agreement, and that despite the COVID related impact on patients and trial centers, the Company should have sought FDA's agreement on these changes prior to analyzing and unblinding the data. FDA further stated that it did not agree that AP-013 could serve as a second pivotal trial for Ampion based on both the change in the analysis population and the analysis of pain only instead of the original prespecified co-primary endpoints.
>
> 'We are very disappointed in FDA's answer. Ampion has been in development for several years, and many shareholders have remained loyal to the company throughout the ups and downs of that development history. Severe osteoarthritis of

the knee is an unmet medical need that affects nearly 17 million people in the United States, and we continue to believe that Ampion is a drug which can provide a safe and efficacious treatment for many of those patients. However, given the points in FDA's answer, it will be very difficult to salvage AP-013 itself as a pivotal trial. Nonetheless, we and our regulatory experts believe there may be ways to do that, and we will follow-up with the FDA in the near term to discuss those options,' said Mike Martino Chief Executive Officer and Chairman of Ampio. 'However, I want to be clear. At this point, I believe the best path forward for Ampio and Ampion is likely conducting a new Phase 3 trial. This management team has learned a great deal from conducting and analyzing the prior trials, including AP-013, and believe we are positioned to design and execute a trial that can lead to BLA approval.'

101.    On this news, the Company's share price dropped $0.09, or 26.5%, from a close of $0.34 on April 20, 2022 to a close of $0.25 on April 21, 2022.

### May 16, 2022 Press Release

102.    On May 16, 2022, the Company issued a press release titled "Ampio Independent Committee to Conduct Investigation," announcing that the Company had formed a Special Committee.

103.    The press release further disclosed that the Special Committee, with the assistance from an independent legal counsel, was in the process of conducting internal investigations into the AP-013 study.

104.    On this news, the Company's share price dropped $0.04, or 18%, from a close of $0.22 on May 16, 2022 to a close of $0.18 on May 18, 2022.

105.    On May 28, 2022, Defendants Bar-Or, Coelho, and Giles, three of the Company's longest serving directors, resigned from the Company.

### July 5, 2022 Proxy Statement

106.    On July 5, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Martino, Stevens, and Buchi solicited the 2022

Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

107.    The 2022 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendant Macaluso, Buchi and Stevens to the Board; and (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

108.    Under the heading "Code of Business Conduct and Ethics," the 2022 Proxy Statement stated:

> We have adopted a Code of Business Conduct and Ethics that is applicable to all of our employees, officers, and directors, all of which have read, acknowledged, and agreed to comply with such code. The code is available on our web site, *www.ampiopharma.com*, under the "Investors" tab. We intend to disclose future amendments to, or waivers from, certain provisions of our Code of Business Conduct and Ethics, if any, on the above website within four business days following the date of such amendment or waiver.

109.    Under the heading "Insider Trading Policy," the 2022 Proxy Statement stated:

> We have adopted an Insider Trading Policy that is applicable to all of our officers and directors and all of our employees, consultants, and contractors (including members of scientific advisory committees), who receive or have access to material nonpublic information about the Company. The Insider Trading Policy prohibits the misuse of material nonpublic information in trading of the Company's securities. The Insider Trading Policy also prohibits short sales, transactions in derivative securities on the Company's securities, pledges of the Company's securities as collateral for loans, and hedging or monetization transactions or similar arrangements with respect to the Company's securities. The Insider Trading Policy is available on our web site, *www.ampiopharma.com*, under the "Investors" tab.

110.    Under the heading "Risk Oversight," the 2022 Proxy Statement stated:

> The Board oversees risk management directly and through its committees associated with their respective subject matter areas. Generally, the Board oversees risks that may affect our business, including operational matters and other matters

that have been adversely impacted by the COVID- 19 pandemic. The Board also reviews and approves the renewal of the Company's annual insurance policies. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. Our Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

The Audit Committee is responsible for oversight of our accounting and financial reporting processes and discusses with management our financial statements, internal controls and other accounting and auditing matters. The Compensation Committee  oversees certain risks related to compensation programs and the Nominating and Governance Committee oversees certain corporate governance risks.

111.    Under the heading "REPORT OF THE AUDIT COMMITTEE," the 2022 Proxy Statement stated, in relevant part:

The Audit Committee evaluates auditor performance, manages relations with the Company's independent registered public accounting firm, and evaluates policies and procedures relating to internal control systems. The Audit Committee operates under a written Audit Committee Charter that has been adopted by the Board, a copy of which is available on the Company's website. All members of the Audit Committee currently meet the independence and qualification standards for Audit Committee membership set forth in the listing standards provided by the NYSE American and the SEC.

112.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company failed to follow the Code of Conduct, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Conduct.

113.    Defendants Martino, Stevens, and Buchi caused the 2022 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 106-111, by failing to disclose that: (1)

the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

114.   As a result of Defendants Martino, Stevens, and Buchi causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) elect Defendant Macaluso, Buchi and Stevens to the Board; and (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

## The Truth Emerges

### August 3, 2022 Press Release

115.   On August 3, 2022, the Company issued a press release titled "Ampio Letter To Stockholders," which contained Defendants Martino and Buchi's Stockholder Letter.

116.   The Stockholder Letter disclosed why the Company conducted an internal investigation, stating:

> As we announced on May 16, 2022, an independent special committee of the Ampio Board of Directors (the "Special Committee") has been conducting internal investigations focused primarily on (1) the statistical analysis of Ampio's AP-013 clinical trial and (2) unauthorized provision of Ampion, an investigational drug that is not approved by the Food and Drug Administration ("FDA"), for use by individuals not participating in clinical trials ("unauthorized use"). These investigations are now completed and the investigations are summarized below.

117.   The Stockholder Letter discussed the Special Committee's primary findings, including that "certain former Ampio executive officers and senior staff were aware" of the fact

that "the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these former Ampio executive officers and senior staff did not fully report the results of the AP-013 trial and the timing of unblinding of data from the AP-013 trial."

118.    The Stockholder Letter further disclosed that the Special Committee's investigations discovered that "certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use."

119.    On this news, the Company's share price dropped $0.05, or 32%, from a close of $0.1562 on August 2, 2022 to a close of $0.1034 on August 3, 2022. Given that the Company's share price traded as high as $2.76 on December 22, 2020, the Company's closing share price of $0.1034 on August 3, 2022 represented a staggering 96.25% fall in value.

120.    The Special Committee's findings were reported to the SEC and the FDA. The Company later admitted that, after seven phase II and III trials involving more than 1,500 patients who were treated with Ampion and more than 1,400 patients who were treated with saline, "Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial verses saline would not be commercially competitive."

### Subsequent Events and Disclosures

*October 4, 2022 Current Report*

121.    On October 4, 2022, the Company filed a current report with the SEC on Form 8-K, stating, in relevant part:

> On October 3, 2022, Ampio Pharmaceuticals, Inc. (the "Company") received written notification from NYSE American LLC ("NYSE American" or the "Exchange") stating that the staff of NYSE Regulation has determined to

commence proceedings to delist the Company's common stock from the Exchange. Trading in the Company's common stock was suspended.

NYSE Regulation staff determined that the Company is no longer suitable for listing pursuant to Section 1033(f)(v) of the NYSE American Company Guide due to the abnormally low trading price of the Company's common stock. The Exchange's application to the Securities and Exchange Commission to delist the Company's common stock is pending, subject to the completion of the Exchange's applicable procedures, including any appeal by the Company of NYSE Regulation's decision.

*               *               *

Prior to receipt of the letter from NYSE American, the Company began actively taking steps to regain compliance with the listing standards of the NYSE American. Specifically, the Company's Board of Directors unanimously approved and recommended that the Company's stockholders approve an amendment to the Company's certificate of incorporation to effect a reverse stock split of the Company's common stock at a ratio of not less than 5-to-1 and not greater than 15-to-1, with the exact ratio to be determined by the Board in its discretion before October 13, 2023 (the "Reverse Stock Split"). The Company has called a Special Meeting of Stockholders for October 13, 2022 to consider the Reverse Stock Split. Consummation of the Reverse Stock Split may increase the price of the Company's shares of common stock and, as a result, would likely enable the Company to maintain a higher market price for its common stock, although there can be no assurance that the Company's stockholders will approve the Reverse Stock Split. There can be no assurance that the Company will appeal the Exchange's determination or the outcome of any such appeal. There can be no assurance that the Exchange will reconsider their decision to delist in light of such appeal.

In the meantime, the Company's common stock will trade on the OTC Pink under the symbol "AMPE". The Company can provide no assurance that its common stock will continue to trade on this market, that brokers will continue to provide public quotes of the Company's common stock on this market or otherwise make a market in the Company's common stock or that the trading volume of the Company's common stock will be sufficient to provide for an efficient trading market.

### October 14, 2022 Current Report

122.   On October 14, 2022, the Company filed a current report with the SEC on Form 8-

K, stating that the Company had convened a Special Meeting of Stockholders on October 13, 2022

to consider for approval a reverse stock split that may increase the price of the Company's shares of common stock to regain compliance with the listing standards of the NYSE. According to the current report, "[g]iven that the holders of 57.83% of the Company's outstanding common stock voted in favor of this proposal, the proposal was approved."

## Repurchases During the Relevant Period

123.   During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company repurchased 138,514 shares of its common stock at inflated prices during the Relevant Period for $78,953.

124.   Specifically, according to the Company's Form 10-Q for the first quarter of 2022, within the Relevant Period during the three months ended March 31, 2022, the Individual Defendants caused the Company to, in January 2022, repurchase 138,514 shares of its own common stock at an average price per share of 0.57, for a total cost to the Company of approximately $78,953.

125.   As the Company's stock was actually only worth $0.10 per share, the lowest price at which it was trading on August 3, 2022, the Company overpaid approximately $65,102 in total.

## DAMAGES TO AMPIO

126.   As a direct and proximate result of the Individual Defendants' conduct, Ampio has lost and expended, and will lose and expend, many millions of dollars.

127.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.    Such losses include the Company's overpayment by nearly $65,102 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

129.    Such losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

130.    As a direct and proximate result of the Individual Defendants' conduct, Ampio has also suffered, and will continue to suffer, a loss of reputation and goodwill. Moreover, a so-called "liar's discount" will adversely affect the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff brings this action derivatively and for the benefit of Ampio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ampio, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

132.    Ampio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.    Plaintiff is, and has continuously been at all relevant times, an Ampio shareholder. Plaintiff will adequately and fairly represent the interests of Ampio in enforcing and prosecuting

its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

134.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

135.     A pre-suit demand on the Board of Ampio is futile and, as a result, excused. At the time of filing, the Board consists of the following four individuals: Defendants Martino, Buchi, and Stevens (the "Director-Defendants"), and non-defendant Elizabeth Varki Jobes (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to two of the four Directors on the Board at the commencement of this action.

136.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make, and/or cause the Company to make, false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and unable to decide whether to pursue action against themselves as well as other perpetrators of the scheme.

137.     In a total breach of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making, and/or causing the Company to make, the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable, and therefore attractive, to investors. As a result of which, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and therefore excused.

138.    Demand is also futile on Defendant Martino for the following additional reasons. Defendant Martino has served as the Company's CEO since November 2021 and as a member of the Board since October 2021. He is thus, as the Company admits, a non-independent director. The Company furnishes Defendant Martino with his primary occupation, and he receives substantial compensation for it, including approximately $1 million during 2021 Fiscal Year. As the Company provides Defendant Martino with his primary occupation and such substantial compensation, it is unlikely he would permit a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, fixing his compensation and considering his future employment with Ampio. Defendant Martino was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. Moreover, he solicited the 2022 Proxy Statement, which contained false and misleading statements, contributing to shareholders reelecting him to the Board. As the Company's highest officer and as a trusted long-time Company director, he failed to conduct adequate oversight of the scheme to make, and to cause the Company to make, false and misleading statements as well as failing to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Martino is a defendant in the Securities Class Action. For these reasons, too, Defendant Martino breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, thus, excused.

139.    Demand is also futile on Defendant Buchi for the following additional reasons. Defendant Buchi has served as a Company director since October 2021. He also serves as Chair of the Board and as a member of the Audit Committee. Moreover, he solicited the 2022 Proxy

Statement, which contained false and misleading statements, contributing to shareholders reelecting him to the Board. As a director, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Buchi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

140.    Demand on Defendant Stevens is also futile for the following additional reasons. Defendant Stevens has served as a Company director since June 2011. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. Moreover, he solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements, contributing to shareholders reelecting him to the Board. As a director, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stevens has served as a Company director since the inception of the first clinical trial of Ampion in 2013, which means he had complete knowledge of what was going on and how the drug was performing. Accordingly, given his extensive background and education in sciences, Defendant Stevens was fully able to comprehend how Ampion was performing. However, he chose to mislead the investing public. For these reasons, Defendant Stevens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

141.    Demand on the Board is futile for the following additional reasons.

142.    Demand is excused in this case because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants' longstanding business and personal relationships with one another, as well as with the other Individual Defendants, prevent them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and from calling into question the Individual Defendants' conduct. As a result of the foregoing, any demand on the Director-Defendants would be futile.

143.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

144.    Ampio has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ampio any part of the damages Ampio suffered and will continue to suffer, thereby. Thus, any demand upon the Director-Defendants would be futile.

145.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

146.    The acts complained of herein constitute violations of fiduciary duties owed by Ampio officers and directors, and these acts are incapable of ratification.

147.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ampio. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Ampio, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

148.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Ampio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

149.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants Martino, Macaluso, Bar-Or, Buchi, Coelho, Giles and Stevens for Violations of Section 14(a) of the Exchange Act**

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

153.    Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

154.    The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company failed to follow the Code of Conduct, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by two of the Individual Defendants, and Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens' failures to report violations of the Code of Conduct.

155.    The false and misleading elements of the 2021 Proxy Statement led to the re-election of Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens, which allowed them to continue breaching their fiduciary duties to Ampio.

156.    Defendants Martino, Stevens, and Buchi caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

157.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company failed to follow the Code of Conduct, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Conduct.

158.    The false and misleading elements of the 2022 Proxy Statement led to the re-election of Defendants Martino, Stevens, and Buchi, which allowed them to continue breaching their fiduciary duties to Ampio.

159.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

160.    Plaintiff on behalf of Ampio has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Breach of Fiduciary Duties**

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

165.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

166.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ampio.

167.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

168.     In further breach of their fiduciary duties owed to Ampio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company overstated its ability to successfully file a BLA for Ampion; (2) the Company exaggerated the AP-013 study's results; (3) the Company misrepresented the AP-013 study's actual timing of unblinding of data; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

169.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

170.     The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase nearly 138,514 of its own shares on the open market at artificially inflated prices, damaging Ampio by nearly $65,102 while two of them engaged in improper insider sales, netting proceeds of approximately $214,468.

171.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

172.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

173.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ampio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.    Plaintiff on behalf of Ampio has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Ampio, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ampio;

(c)    Determining and awarding to Ampio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Ampio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ampio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

     1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     2.  a provision to permit the shareholders of Ampio to nominate at least two candidates for election to the Board; and

     3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)     Awarding Ampio restitution from the Individual Defendants, and each of them;

     (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

     Plaintiff demands a trial by jury on all issues so triable.


Dated: October 25, 2022          Respectfully submitted,

                    **THE ROSEN LAW FIRM, P.A.**

                    /s/ Phillip Kim
                    Phillip Kim
                    275 Madison Avenue, 40th Floor
                    New York, NY 10016
                    Telephone: (212) 686-1060
                    Facsimile: (212) 202-3827
                    Email: pkim@rosenlegal.com

                    *Counsel for Plaintiff*

DocuSign Envelope ID: 2F709391-B30D-4057-A1DA-4374A802A987

## VERIFICATION

I, Samantha Marquis am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 10/24/2022 , 2022.

Samantha Marquis